[Crim. No. 20964. Oct. 24, 1979.]

In re STIG FLODIHN on Habeas Corpus.

562

**COUNSEL**

Quin Denvir, State Public Defender, Gary S. Goodpaster and Ezra Hendon, Chief Assistant State Public Defenders, Mark L. Christiansen, Richard L. Phillips and Thomas F. Lundy, Deputy State Public Defenders, for Petitioner.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, John T. Murphy, Karl S. Mayer and Kenneth C. Young, Deputy Attorneys General, for Respondent.

**OPINION**

**RICHARDSON, J.**—Petitioner, convicted of narcotics offenses in 1975, was initially sentenced pursuant to the Indeterminate Sentence Law (ISL) then in effect. Once the Determinate Sentencing Act (DSL) became operative on July 1, 1977, petitioner was screened for a "serious offender" hearing pursuant to the provisions of Penal Code section 1170.2, subdivision (b). (All further statutory references are to that code unless otherwise cited.) For the reasons set forth below, we conclude that the

method by which petitioner was screened for such a hearing by procedures of the Community Release Board (CRB), neither created suspect classifications nor affected his fundamental "liberty" interest, nor did the resulting recomputation of petitioner's release date deny him the equal protection of the laws.

On March 11, 1975, petitioner was convicted by a jury of violating Health and Safety Code sections 11351 (possession of heroin for sale) and 11377 (possession of a controlled substance). The ISL terms then in effect on the possession of sale count were 5 to 15 years, with a minimum eligible parole date of 30 months, and 1 to 10 years on the possession charge.

At the time of the arrest which led to the March 1975, conviction petitioner was on parole in connection with a November 27, 1970, conviction for violation of Health and Safety Code sections 11501 (sale of a narcotic) and 11531 (sale of marijuana). The parole had been in effect as of April 1973, and petitioner's record reveals no other convictions.

On July 1, 1977, the DSL became effective. By its terms only those individuals who have committed offenses on or after July 1, 1977, are sentenced to determinate terms. Those individuals who have committed offenses prior to that date are sentenced to indeterminate terms and have their DSL term/parole date computed as follows:

"(a) In the case of any inmate who committed a felony prior to July 1, 1977, who would have been sentenced under Section 1170 if he had committed it after July 1, 1977, the Community Release Board shall determine what the length of time of imprisonment would have been under Section 1170 without consideration of good-time credit and utilizing the middle term of the offense bearing the longest term of imprisonment of which the prisoner was convicted increased by any enhancements justified by matters found to be true and which were imposed by the court at the time of sentencing for such felony. Such matters include: being armed with a deadly or dangerous weapon . . .; using a firearm . . .; infliction of great bodily injury . . .; any prior felony conviction . . . which prior felony conviction is the equivalent of a prior prison term . . .; and any consecutive sentence.

"(b) If the calculation required under subdivision (a) is less than the time to be served prior to a release date set prior to July 1, 1977, or if a release date had not been set, the Community Release Board shall

establish the prisoner's parole date, subject to subdivision (d), on the date calculated under subdivision (a) unless at least two of the members of the Community Release Board after reviewing the prisoner's file, determine that due to the number of crimes of which the prisoner was convicted, or due to the number of prior convictions suffered by the prisoner, or due to the fact that the prisoner was armed with a deadly weapon when the crime was committed, or used a deadly weapon during the commission of the crime, or inflicted or attempted to inflict great bodily injury on the victim of the crime, the prisoner ·should serve a term longer than that calculated in subdivision (a), in which event the prisoner shall be entitled to a hearing before a panel consisting of at least two members of the Community Release Board . . . . The Community Release Board shall notify each prisoner who is scheduled for such a hearing within 90 days of July 1, 1977, or within 90 days of the date the prisoner is received by or returned to the custody of the Department of Corrections, whichever is later. The hearing shall be held before October 1, 1978, or within 120 days of receipt of the prisoner, whichever is later. It is the intent of the Legislature that the hearings provided for in this subdivision shall be accomplished in the most expeditious manner possible . . . . In fixing a term under this section the board shall be guided by, but not limited to, the term which reasonably could be imposed on a person who committed a similar offense under similar circumstances on or after July 1, 1977, . . ." (§ 1170.2, subds. (a), (b).)

On July 1, 1977, the date when the DSL became operative, petitioner was serving his ISL term at Soledad Prison. Before that date, the Adult Authority had assigned him a primary discharge date of October 6, 1981, with a tentative parole date of September 6, 1979. Section 1170.2 provides that the DSL shall be retroactive to the extent that a new agency, the CRB, shall calculate release dates under the DSL for all inmates serving indeterminate terms at the time when the DSL became operative.

Under the procedure set out in section 1170.2, subdivision (a), subject to CRB approval, Department of Corrections staff tentatively calculated petitioner's DSL release date, with good time credit, as September 3, 1977. This date was approximately two years earlier than the parole date that had previously been set for him by the Adult Authority under the ISL.

Section 1170.2, subdivision (b), provides that where the DSL release date is *later* than the inmate's ISL release date, the inmate shall keep his ISL release date. On the other hand, where the DSL release date is

*earlier,* or where no ISL release date has been set, the DSL release date is to become the inmate's release date unless his term is fixed pursuant to section 1170.2, subdivision (b).

As noted above, section 1170.2, subdivision (b), specifies the criteria by which the CRB may identify an inmate as possibly meriting a longer DSL term. If, due to the presence of any of the factors therein described, the term authorized by subdivision (a) is not appropriate, the CRB may, after a hearing (a serious offender hearing), fix a longer term.

As of July 1, 1977, there were approximately 22,000 prisoners affected by the new legislation. The CRB was not able to hold a serious offender hearing in the case of every inmate who had not been given an ISL release date, or whose tentative DSL release date was earlier than the ISL release date which had been given to the prisoner. Section 1170.2, subdivision (b), required that if the CRB intended to establish a prisoner's parole date on a date other than that set forth in subdivision (a), it was required to notify that prisoner that he was entitled to a hearing to be held within *90* days of July 1, 1977. Section 1170.2, subdivision (b), specifically provided that "It is the intent of the Legislature that the hearings provided for in this subdivision shall be accomplished in the most expeditious manner possible." Because of the number of prisoners involved, there was a considerable problem in sorting through the thousands of prisoner files and identifying those inmates who might be subject to a serious offender hearing and then determining which of the latter should in fact have such hearings. As an administrative necessity, the CRB adopted regulations providing for a "screening" system so that only a manageable number of inmates who met certain criteria would be considered for longer term enhancement and given serious offender hearings.

The CRB's screening criteria are described in the California Administrative Code, title 15, section 2162, subdivision (b), adopted July 1, 1977. At the time petitioner was selected for a serious offender hearing, the following were subject to such a hearing under section 2162: those who (1) had been convicted of certain enumerated crimes, each of which involved violence or sexual misconduct accompanied by the use of force; (2) had received consecutive terms; (3) had suffered three or more felony convictions for certain enumerated crimes, or five or more felony convictions for any crimes; (4) had served two or more prior prison terms; (5) were serving sentences for crimes involving deadly weapons, firearms, or great bodily injury to the victim; or (6) whose ISL parole date was

more than one year later than their tentative DSL release date. Those inmates subject to ISL who were not included within any of these six categories received the tentative DSL release date.

The files of those inmates included in one of the foregoing categories were reviewed preparatory to a possible serious offender hearing. If such a hearing was held, the prisoner might or might not receive a serious offender term. The initial classifications only pointed to those inmate files which merited closer scrutiny. On October 24, 1977, and effective November 26, 1977, by amendment to the rule, subdivision (b)(6), the disparate term provision, was deleted. By that date, because of the requirements of section 1170.2, subdivision (b), all persons who were to have hearings would have been notified of that fact.

Petitioner, as the above facts indicate, was subject only to the sixth enumerated category, and was considered for sentence enhancement only because his ISL parole date was more than one year later than his tentative DSL release date. After reviewing petitioner's file the CRB concluded that an extended term of imprisonment was appropriate, given petitioner's prior prison term. Prior to his "serious offender" hearing an analysis of his case was prepared by the CDC staff which set forth the maximum DSL term possible, in this case a 36-month-middle term for a violation of Health and Safety Code section 11351, an additional 8 months for a violation of Health and Safety Code section 1170.1, and an additional 12 months because of petitioner's prior prison term. Following a hearing which was held in compliance with the provisions of sections 1170.2, subdivision (b), and 3041, the CRB issued its order assessing the maximum DSL term.

Petitioner contends that the CRB's use of the discrepancy between an inmate's ISL tentative parole date and his tentative DSL release date, as a ground for considering an inmate for a serious offender term, was improper. According to petitioner, CRB thereby created two classes of inmates as of July 1, 1977, which classes were identical in all respects except that those in petitioner's class had already had an ISL tentative parole date fixed, a fact which subjected them to screening for possible serious offender treatment. Inmates without an ISL parole date set obviously could not be subject to sentence enhancement on the basis of the term discrepancy alone.

Petitioner argues that because this classification could lead to differential punishment, his personal liberty, which is concededly a fundamental

interest, was directly affected (*People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]) thereby invoking strict scrutiny of the classification. Petitioner contends, further, that administrative convenience does not justify the procedures and asserts that he has been denied equal protection of the laws.

We reject the argument. ■ The United States Supreme Court has recognized that where the classification scheme adopted by a statute has only an incidental or marginal effect on "fundamental" rights, application of the "rational relationship" test is the appropriate analytical standard. (*Zablocki* v. *Redhail* (1978) 434 U.S. 374, 386 [54 L.Ed.2d 618, 630-631, 98 S.Ct. 673]; *Califano* v. *Jobst* (1977) 434 U.S. 47, 53-54 [54 L.Ed.2d 288, 234-235, 98 S.Ct. 95].)

■ Our examination of the classification procedure reveals that the challenged screening criterion did not directly affect the length of time an inmate spent in custody. Rather, as noted above, it was used, along with other criteria, merely to accomplish a rough sorting of the approximately 22,000 inmate files. Any change in custody status occurred only after a properly conducted serious offender hearing. For this reason petitioner is incorrect in his assertion that a fundamental interest is involved in the classification process itself. Because no fundamental liberty interest is directly affected by this procedure, the classification need not meet the higher "strict scrutiny" standard.

While a fundamental interest was not directly involved in the screening process, it is true that those inmates singled out for more careful consideration on the basis of the criterion did receive different treatment than that accorded their fellow inmates. We conclude, however, that the challenged administrative procedures have a rational basis and are consistent with the legislative purpose to effect reclassifications in an expeditious manner.

As noted above, the fact of a substantially later ISL parole release date alerted staff making the screening decision to examine the inmate's record closely to determine the basis for the Adult Authority's initial determination that the inmate should be detained for a longer period than that for the base offense on which the DSL middle term was computed. Such a discrepancy reasonably signalled to staff the possible existence of factors, not readily apparent on initial mechanical reviews, which might merit an extended term under section 1170.2, subdivision

(b). Where such a discrepancy was revealed, a closer review by the CRB was permissible and altogether proper.

The Adult Authority's ISL term-fixing procedures in effect before the DSL became operative routinely added custodial time in order to reflect concurrent terms, prior convictions, and crimes committed under aggravating circumstances such as unnecessary brutality or cruelty. The DSL terms established by the Legislature reflect the *average* time served for those offenses under the ISL. Thus an ISL parole date which was later than the DSL term reasonably warned staff that the test for serious offender treatment might be found in the inmate's record.

As this standard served only as an adjunct to the other screening measures, the assumption by petitioner that a prisoner without a fixed ISL parole date would not be screened for a serious offender hearing is fallacious. A review of any prisoner's file for priors or multiple concurrent terms, two of the other criteria, could lead to the identification of prisoners similarly but not identically situated with petitioner as possible candidates for serious offender terms. While the CRB's tests might have been underinclusive and may have missed some prisoners who could have been given longer terms, because the criterion did further the statutory purpose of avoiding disparate terms, its use in identifying prisoners was perfectly proper.

During the operative life of the ISL there were many prisoners who received concurrent terms, or who were not charged with or convicted of prior felonies, arming, or other facts which could have supported enhancements. Often this was the result of plea bargains agreed to by the People, or because of decisions not to bother with charging or proving these enhancing factors, or because of sentences imposed by the court in the knowledge that the wide range of term-fixing discretion vested in the Adult Authority would result in a substantial term, making it unnecessary to include the findings that would compel enhanced terms.

Petitioner is an example of the type of prisoner to whom the serious offender provisions might well have been directed. He was sentenced following his conviction of two narcotics offenses and he had two prior narcotics convictions for which he had served a single term. He could have been charged with the prior felony convictions which, had they been found and included in the judgment, would have resulted in an increase in the term for violation of section 11351 to 10 years to life. He could also have been sentenced to consecutive terms. A person who had committed

these offenses after July 1, 1977, might well have been charged with the priors and have had an aggravated term or consecutive terms imposed by the court in the reasonable belief that a three-year DSL term did not fully reflect his culpability. The Adult Authority had concluded that his term should be twice as long as the DSL middle term. Subdivision (b) of section 1170.2 was enacted for the purpose of identifying such ISL prisoners and permitting their DSL terms to be fixed at a number of years equal to or longer than those which could have been imposed under the DSL. We conclude, accordingly, that the CRB's screening criteria which resulted in petitioner being selected for a serious offender hearing is rationally related to the state's purpose in minimizing the disparity in sentencing of prisoners convicted before and after July 1, 1977.

Petitioner argues that the CRB's procedure was contrary to the legislative intent, which he gleans from his reading of subdivision (b), to use serious offender hearings to deal only with prisoners who had committed crimes of violence. Petitioner rests his argument on the admonition in subdivision (b) that the board be guided by the legislative finding "that the necessity to protect the public from repetition of extraordinary crimes of violence against the person is the paramount consideration." That admonition, however, is directed to the length of the DSL terms which may be fixed under subdivision (b) in which the CRB is to be "guided by but not limited to" the post-July 1, 1977, DSL terms. Contrary to petitioner's assertion, it is not a restriction permitting serious offender terms only for persons who have committed crimes of violence. ■ Subdivsion (b) expressly permits serious offender terms for prisoners for whom the regular DSL term would not be appropriate in light of the number of crimes of which they have been convicted or the number of prior convictions, without limitation as to the nature thereof.

Petitioner also challenges the DSL term-fixing procedure on the ground that no ascertainable or definite standards are established. We reject this contention. Legislative standards are included in subdivision (b) of section 1170.2 and the DSL terms and sentencing rules are used as guidelines pursuant to statutory mandate. In any case the fact that the considerations relevant to the ultimate term-fixing were not themselves among the criteria for initial screening is itself irrelevant. The screening factors served only to identify inmates for whom the regular DSL term might be inappropriate. Once petitioner was so identified, his entire record was examined and all factors relevant to the appropriate term were fairly considered.

The petition for writ of habeas corpus is denied.

Tobriner, J., Mosk, J., Clark, J., and Manuel, J., concurred.

**BIRD, C. J.**—I respectfully dissent for the reasons so eloquently stated by Justice Feinberg of the First Appellate District. For this reason, I herewith reprint his opinion.

"This is a petition for a writ of habeas corpus challenging the Community Release Board's enhancement of petitioner's sentence pursuant to a serious offender hearing (Pen. Code, § 1170.2, subd. (b)). Since the procedure whereby petitioner was selected for a serious offender hearing violated article I, section 7 of the California Constitution, and the Fourteenth Amendment to the Constitution of the United States, we grant his petition. For the reasons set forth herein, petitioner should be released forthwith from parole.[1]

Pursuant to a March 10, 1975 jury conviction, petitioner was sentenced to prison for the terms prescribed by law for two offenses: possession of heroin for sale (Health & Saf. Code, § 11351), and possession of a controlled substance (Health & Saf. Code, § 11377). Petitioner was given concurrent terms under the Indeterminate Sentence Law (ISL) then in effect.

At the time of the arrest which led to the March 10, 1975 conviction, petitioner was on parole in connection with a November 27, 1970 conviction of sale of a narcotic (Health & Saf. Code, § 11501) and sale of marijuana (Health & Saf. Code, § 11531). Petitioner's record reveals no other convictions.

On July 1, 1977, the date when the Determinate Sentence Law (DSL) went into effect, petitioner was serving his ISL term at Soledad Prison. Before that date, the Adult Authority had assigned him a primary

---

[1]On rehearing, respondent argues that the petition is moot because petitioner was released on parole on October 13, 1978. It would seem that the petition is not moot since petitioner is currently on parole and subject to all of the restrictions and supervision normally demanded of parolees. In fact, if this action is dismissed as moot, petitioner will be subject to the supervision and custody of his parole officer until October 12, 1979. (Pen. Code, § 3000, subd. (a).) However, if petitioner should have been released from prison in September 1977, his parole would have terminated in September 1978. (See *In re Haygood* (1975) 14 Cal.3d 802 [122 Cal.Rptr. 760, 537 P.2d 880]; *People* v. *Amsbary* (1975) 51 Cal.App.3d 75 [125 Cal.Rptr. 546]; *People* v. *Andre* (1974) 37 Cal.App.3d 516 [112 Cal.Rptr. 438].)

discharge date of October 6, 1981, with a tentative parole date of September 6, 1979. Penal Code section 1170.2 provides that the DSL shall be retroactive to a certain extent. That section provides that a new agency, the Community Release Board (CRB), should calculate tentative release dates under the DSL for all inmates serving ISL terms at the time when the DSL became effective. Under the procedure set out in Penal Code section 1170.2, subdivision (a), subject to CRB approval, CRB staff calculated petitioner's DSL tentative release date, with good time credit, as September 3, 1977. This date was approximately two years earlier than the parole date that had previously been set for him by the Adult Authority under the ISL.

Penal Code section 1170.2, subdivision (c) provides that where the tentative DSL release date is *later* than the inmate's ISL release date, the inmate shall keep his ISL release date. On the other hand, where the tentative DSL release date is *earlier,* or where no ISL release date has been set, the tentative DSL release date is to become the inmate's release date, unless his sentence is enhanced pursuant to section 1170.2, subdivision (b).

Section 1170.2, subdivision (b) states the grounds on which the CRB may enhance an inmate's tentative DSL sentence. Pursuant to a hearing, hereafter termed a "serious offender hearing," the CRB may enhance an inmate's sentence "due to the number of crimes of which the prisoner was convicted, or due to the number of prior convictions suffered by the prisoner, or due to the fact that the prisoner was armed with a deadly weapon when the crime was committed, or used a deadly weapon during the commission of the crime, or inflicted or attempted to inflict great bodily injury on the victim of the crime." (§ 1170.2, subd. (b).)

The CRB did not hold a serious offender hearing in the case of every inmate who had not been given an ISL release date, or whose tentative DSL release date was earlier than the ISL release date which he had been given. As an administrative convenience, the CRB adopted regulations providing for a "screening" system so that only inmates who met certain threshold criteria would be considered for DSL enhancement and given serious offender hearings. The CRB's screening criteria are set out in the California Administrative Code, title 15, section 2162, subdivision (b)(1)-(6)[2] adopted July 1, 1977. At that time that petitioner was selected for a

---

[2]Hereinafter, all section references are to the California Administrative Code, title 15, unless otherwise indicated.

serious offender hearing, only inmates who met one of the following screening criteria were subject to such a hearing under section 2162: (1) persons who had been convicted of certain enumerated crimes, each of which entails violence or sexual misconduct involving the use of force; (2) persons upon whom consecutive sentences had been imposed; (3) persons who had suffered three or more felony convictions for certain enumerated crimes, or five or more felony convictions for any crimes; (4) persons with two or more prior prison terms; (5) persons serving sentences for crimes involving deadly weapons, firearms, or great bodily injury to the victim; or (6) persons whose ISL parole date was more than one year later than their DSL release date. Any inmate under the ISL who did not fall into any of these six categories would not be subject to having his tentative DSL sentence enhanced, and hence the tentative DSL release date would be assigned to him as his release date.

Petitioner, as the facts set out above demonstrate, fell within only one of these six categories, namely, the sixth. Thus, he was considered for sentence enhancement only because his ISL parole date was more than one year later than his tentative DSL release date.[3] Subsequently, when the CRB had screened all inmates who had been given ISL parole dates, the sixth criterion became obsolete, and the regulation was amended to delete it.[4]

Petitioner was eventually given a serious offender hearing and, on the basis of his two convictions for drug-related offenses, and his single prior prison term, his tentative DSL sentence was enhanced by a total of twenty months with a tentative release date of June 1979.[5]

---

[3]Respondent directs our attention to the fact that the screening process consisted of several stages, each stage designed to selectively determine those ISL prisoners whose sentences should be enhanced and that from stage to stage the criteria varied. We have not sought to analyze the screening process beyond the first stage for the reason that a prisoner did not pass from the first stage to the second unless he "failed" the first. Thus, if petitioner passed to the second stage by reason of a constitutionally defective standard in the first stage, our inquiry can end at that point.

[4]The Adult Authority was abolished on July 1, 1977. Thus, there are and will continue to be prisoners who committed crimes prior to July 1, 1977 and were or will be sentenced under the ISL, but for whom, of course, no tentative parole date was or will be set because either they were received in prison before July 1, 1977, but too late to have the Adult Authority set a tentative parole date or because they were received in state prison after the Adult Authority went out of existence.

[5]Petitioner's serious offender hearing took place on November 18, 1977. Ironically, section 2162, subdivision (b)(6) was deleted by the Community Release Board by amendment of section 2162 promulgated October 24, 1977, effective November 26, 1977.

### A. *The method whereby petitioner was selected for a serious offender hearing deprived petitioner of his right to equal protection of the law.*

The CRB's use of the discrepancy between an inmate's ISL tentative parole date and his tentative DSL release date, as a ground for considering an inmate for sentence enhancement, created two classes of inmates as of July 1, 1977. The inmates in the two classes were identical in every respect except one: those in one class had had an ISL parole date set which was more than a year longer than the tentative release date calculated under the DSL, while those in the other class either had not had an ISL parole date or had one less than a year longer than the DSL tentative release date. An inmate whose record was identical to petitioner's, but who had not been assigned an ISL release date, would not have fallen into any of the categories of inmates who were liable for serious offender hearings and sentence enhancement, under section 2162, subdivision (b). With the deletion of the criterion involving release date discrepancy, all inmates sentenced under the ISL whose records are identical to petitioner's are now routinely passed over by the CRB in its screening of the prison population for candidates for sentence enhancement. Thus, petitioner was swept into the sentence enhancement process, and ultimately sentenced to serve 20 additional months in prison, simply by virtue of the fact that the Adult Authority had assigned him a tentative parole date which was more than a year after a tentative release date calculated under the DSL.

Since his membership in the class created by the rule determined that petitioner's sentence might be substantially enhanced, this is clearly a classification which touches petitioner's interest in personal liberty, a fundamental interest for purposes of equal protection analysis. (*People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375].) Therefore, the CRB's rule is not clothed in a presumption of constitutionality; the people must prove that this classification is necessary to some compelling state interest. In other words, the CRB rule is subject to a strict scrutiny standard of judicial review. (17 Cal.3d at p. 251.)

The reason for the use of the sentence discrepancy criterion, as argued by the people in this case, was administrative convenience. Penal Code section 1170.2, subdivision (b), authorizes the CRB to consider sentence enhancement in the case of any inmate who either (1) had no ISL release date assigned, or (2) had had an ISL release date assigned that was later than his tentative DSL release date. Rather than giving all such inmates

serious offender hearings, the CRB used its screening procedure to obviate the necessity of hearings for inmates whose records showed no apparent grounds for enhancement. The problem which petitioner's case illustrates arose, not because a screening system was used, but because one of the *particular* criteria used operated inequitably in that it created two classes of similarly situated inmates who were nevertheless subject to different treatment.[6] It does not appear that this particular classification serves the interest of administrative convenience, as argued; it does not appear, in fact, that it serves any state interest at all, whether compelling or not. But even if the challenged criteria did facilitate the processing required in the changeover from the ISL to the DSL, we had not thought it to be the law that constitutional rights could be sacrificed on the altar of administrative convenience.

B. *Insofar as application of section 2162, subdivision (b)(6) resulted in different sentences for similarly situated inmates, that section was inconsistent with the purpose of the statute it was designed to implement.*

In the Declaration of Purpose prefacing the Determinate Sentence Law (Pen. Code, § 1170), the Legislature specified that uniformity of sentence for offenders "committing the same offense under similar circumstances" is a fundamental purpose of the Determinate Sentence Law. That the CRB should adopt rules resulting in widely different sentences for inmates similarly situated is thus directly contrary to the stated purpose of the law. To the extent that section 2162 was such a rule, it was invalid under Government Code section 11374.[7]

---

[6]See *In re Kapperman* (1974) 11 Cal.3d 542 [114 Cal.Rptr. 97, 522 P.2d 657], in which the court held that a statute which granted inmates credit against their prison terms for time spent in pretrial custody, but which only operated prospectively, denied equal protection to inmates convicted before the statute became effective. The court cited with approval an Illinois decision which held that a similar statute "was invalid as creating an arbitrary discrimination based upon the fortuitous circumstances of conviction date." (At p. 547, fn. 6.) Similarly, section 2162, subdivision (b)(6) operated to discriminate between inmates on the basis of the "fortuitous circumstances" of the assignment of an ISL tentative parole date.

[7]Government Code section 11374 provides: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.

"Any existing rules or regulations conflicting with this section are hereby repealed."

C. *The fact that the CRB's decision at petitioner's serious offender hearing was not grounded on clearly defined criteria, deprived petitioner of due process of law.*

Pursuant to his serious offender hearing, petitioner received the maximum sentence enhancement possible for his prior prison term and multiple convictions. (See §§ 2166, 2167.) However, according to section 2162, those prior and multiple convictions were not in themselves sufficient to "qualify" petitioner for a serious offender hearing in the first place. This anomaly suggests that, at petitioner's hearing, the CRB applied criteria not stated in its official reasons for its decision. If the CRB applied unstated criteria in the serious offender hearing given petitioner, that in itself would be a sufficient ground for overturning the board's decision. (*Franklin* v. *Shields* (4th Cir. 1977) 569 F.2d 784; see also *Grattan* v. *Sigler* (9th Cir. 1975) 525 F.2d 329.) The people argue that the CRB simply relied on the criteria for enhancement set out in the statute, Penal Code section 1170.2, subdivision (b). But the fact that the CRB could enhance petitioner's sentence in reliance on factors that the board itself apparently considered insufficient to justify an enhancement hearing in the first place, suggests that the CRB may have acted arbitrarily in enhancing petitioner's tentative DSL sentence.

The procedure whereby petitioner was selected for a serious offender hearing deprived him of equal protection of the laws; and the fact that the CRB had not adequately defined the criteria for enhancement of sentence resulted, in petitioner's case, in a deprivation of due process of law. Had the sentence discrepancy criterion not been a part of the screening process at the time petitioner's case was considered, petitioner's sentence would not have been enhanced; his tentative DSL release date would have become his release date. In the circumstances of this case, then, justice requires that petitioner's tentative DSL release date be reinstated as his release date."

Newman, J., concurred.