[L.A. No. 31415. Dec. 2, 1982.]

FULLERTON JOINT UNION HIGH SCHOOL DISTRICT,
Plaintiff and Appellant, v.
STATE BOARD OF EDUCATION, Defendant and Appellant.

**COUNSEL**

Parker & Covert, Clayton H. Parker and Spencer E. Covert, Jr., for Plaintiff and Appellant.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and John H. Sanders, Deputy Attorneys General, James L. Markman, Andrew V. Arczynski and Ralph D. Hanson for Defendant and Appellant.

OPINION

**BROUSSARD, J.**—The community of Yorba Linda has its own elementary school district, but is part of the Fullerton Joint Union High School District (Fullerton HSD). The State Board of Education (State Board) approved a plan (the Plan) to create a new Yorba Linda Unified School District[1] and transfer responsibility for high school education of Yorba Linda students from the Fullerton HSD to the new district. The State Board directed that the proposal be submitted for approval in an election limited to the residents of Yorba Linda.

Fullerton HSD petitioned for mandate to prevent the election. The trial court upheld portions of the State Board's decision, but held invalid other portions, including the limitation of the franchise to Yorba Linda residents, and accordingly barred the election. Both parties appealed.

The appeal presents three issues: (1) Did the State Board comply with the requirements of Education Code section 4200, which specifies the conditions which must be met before the State Board authorizes the creation of a new school district? (2) Is the State Board's decision invalid for noncompliance with the California Environmental Quality Act (Pub. Resources Code, § 21050 et seq.)? (3) Does the State Board's decision limiting the vote to Yorba Linda residents deny the equal protection of the laws to other residents of the Fullerton HSD?

With respect to the first issue, the parties agree that a reviewing court may inquire only whether the State Board's decision was arbitrary, capricious, or entirely lacking in evidentary support; applying that standard of review, we find that the State Board's decision complied with section 4200. We conclude, however, that the State Board's failure to undertake a threshold environmental study violated the California Environmental Quality Act, and that its limitation of the electoral franchise was unconstitutional.

1. *Statement of facts.*

The Yorba Linda Elementary School District is completely surrounded by two unified school districts: Brea-Olinda to the north, and Placentia to the west, south and east. The territory included in the Yorba Linda Elementary School District is also a part of Fullerton HSD, but being surrounded by two other districts, it is not contiguous to the remainder of Fullerton HSD. Because there is no high school in Yorba Linda approximately 1,200 Yorba Linda high school

---

[1]A "unified school district" is one which offers courses in grades kindergarten through twelve. Yorba Linda Elementary School District presently only serves grades kindergarten through eight.

students must be bused 5 to 7 miles, across a portion of Placentia Unified School District, to Troy High School, the nearest high school in the Fullerton HSD system.

The isolation of the Yorba Linda portion of Fullerton HSD from the remainder of the district created a number of problems. High school students had to make a lengthy round trip each day to and from school. The distance also imposed burdens on students who wanted to participate in extracurricular activities. In view of these facts, the Orange County Committee on School District Organization (County Committee) prepared the Plan to create a Yorba Linda Unified High School District. In effect, the Yorba Linda portion of Fullerton HSD would "secede" and become unified with Yorba Linda Elementary.

Section 4200 of the Education Code[2] requires that a school organization plan must substantially meet the following conditions: (a) the new districts will have adequate enrollment; (b) the new districts will be adequate in terms of financial ability; (c) the new districts will each have a substantial community identity; (d) the proposal will result in an equitable division of property and facilites of the original district; and (e) the formation of the new district will not promote racial or ethnic discrimination or segregation.

The County Committee found that all statutory requirements were met and submitted the Plan to the State Board for approval. In addition, the County Committee determined that the election be held in the area proposed for unification only (Yorba Linda), and not throughout the entire Fullerton HSD.

Before approving the Plan, the State Board must find substantial compliance with the statutory requirements of section 4200, and it must also review the propriety of the County Committee's designation of the territory in which the election will be held. To assist the State Board, the State Department of Education submitted a report which analyzed each of the statutory conditions, found substantial compliance, and approved limiting the election to the Yorba Linda area. At its first hearing the State Board requested further information on the racial impact of removing Yorba Linda from the Fullerton HSD, but after considering that information it voted unanimously to approve the Plan.

Fullerton HSD, which opposed the unification proposal, filed a petition for writ of mandate in the superior court, contending that the Plan did not meet the statutory criteria and that the election was improperly restricted to Yorba Linda. The trial court ruled that the Plan substantially met the requirements of ade-

---

[2]All code references shall be to the Education Code, unless otherwise indicated. Education Code references shall be to the section numbers of the reorganized code.

quate enrollment, adequate financial ability, community identity, and equitable division of the property. However, the trial court held that the State Board had abused its discretion and acted arbitrarily and capriciously because (1) the Plan did not intend to promote racial or ethnic segregation or discrimination; (2) the State Board did not comply with the California Environmental Quality Act; and (3) for a variety of reasons, the voters of the entire Fullerton HSD should vote on the Plan, and their exclusion from the election violated their fundamental right to vote.

## 2. *Compliance with section 4200.*

The parties initially agree that the action in the trial court was a traditional mandate proceeding pursuant to Code of Civil Procedure section 1085 and not an administrative mandamus pursuant to Code of Civil Procedure section 1094.5. They further agree that the exercise by the State Board of the authority to approve proposals for the formation of unified school districts pursuant to the legislative directive of sections 4200-4419 is a "quasi-legislative" act.[3]

 In reviewing such quasi-legislative decisions, the trial court does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the administrative agency. The authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]; *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 605-607 [241 P.2d 283].)

Applying this test of review, we examine the State Board's finding that the Plan substantially complies with the requirements of section 4200. That section provides in relevant part as follows:

"The State Board of Education may approve proposals for the formation of districts based upon the division of the territory of existing high school districts, provided that the board has determined, with respect to the proposal and the resulting new districts that the following conditions are substantially met:

---

[3]Subject only to constitutional limitations, the Legislature has plenary power over the formation, dissolution or change of boundaries of school districts. (Cal. Const., art. IX, § 5; *Worthington S. Dist.* v. *Eureka S. Dist.* (1916) 173 Cal. 154 [159 P. 437]; 29 Ops.Cal.Atty. Gen. 82 (1957).) "The power to change the boundaries of the [school] district, as well as to define them in the first instance, is of legislative origin, and, whether exercised immediately by the legislature or mediately by a board of supervisors—the local legislature—is, whenever exercised, a legislative act." (*Hughes* v. *Ewing* (1892) 93 Cal. 414, 417 [28 P. 1067]; see *Antelope Val. U. H. S. Dist.* v. *McClellan* (1921) 55 Cal.App. 244, 247 [203 P. 147].)

"(a) That the new districts will be adequate in terms of number of pupils enrolled.

"(b) That the new districts will be adequate in terms of financial ability. For purposes of determining financial ability, consideration shall be given to revenue limits per pupil, assessed valuation per pupil, and tax rates. . . .

"(c) That the new districts are each organized on the basis of a substantial community identity.

"(d) That the proposal will result in an equitable division of property and facilities of the original district.

"(e) That the proposal and the formation of the new districts will not promote racial or ethnic discrimination or segregation. . . ."

As we have noted, the State Board found that all five criteria had been substantially met. The trial court ruled that the last condition, i.e., that the Plan must not promote racial segregation, was not met. On appeal, the State Board contends that the Plan does not promote racial segregation, while Fullerton HSD contends that it does not comply with the conditions of adequate enrollment, financial ability and equitable division of the property.

(a.) *Specific Findings*

■ Preliminarily, Fullerton HSD argues that the State Board action was invalid because it did not specifically state how the Plan substantially complied with the conditions enumerated in section 4200, subdivisions (a)-(e). Fullerton HSD relies on Code of Civil Procedure section 1094.5, the administrative mandamus provision, which impliedly requires the administrative agency in adjudicatory decisions to make some findings "to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) However, as we have stated, in approving the Plan the State Board was exercising a "quasi-legislative" function reviewable by traditional mandamus. (Code Civ. Proc., § 1085.) Because the decision approving the Plan to create Yorba Linda Unified School District was not an adjudicatory decision made as the result of a proceeding in which by law a hearing is required to be given and evidence required to be taken, Code of Civil Procedure section 1094.5 and cases dealing with such adjudicatory hearings are inapplicable.

Furthermore, even where findings are required, the administrative agency is not required to make formal findings as would be required in a court of law. An administrative agency may adopt the findings prepared by another body. (*Carmel Valley View, Ltd.* v. *Board of Supervisors* (1976) 58 Cal.App.3d 817, 823 [130 Cal.Rptr. 249].) The State Board in effect adopted the findings of the County Committee as contained in the proposed Plan.[4] These findings are fully adequate to allow meaningful judicial review of the quasi-legislative action of the State Board for the purpose of determining whether the action was arbitrary, capricious or without evidentiary support.

(b.) *Adequate Enrollment*

 Fullerton HSD contends that the State Board acted arbitrarily in finding that the proposed Yorba Linda Unified School District would be adequate in terms of number of pupils enrolled.

Section 4200, subdivision (a) does not itself specify what is meant by "adequate in terms of number of pupils enrolled." Pursuant to statutory mandate, the State Board adopted regulations (Cal. Admin. Code, tit. 5, §§ 18570-18574) to serve as guidelines for determining whether a proposal complies with section 4200.[5] Those guidelines advise that each proposed school district will, at the time the proposal becomes effective, be adequate if it substantially complies with the following enrollment standards:

Elementary District ........................................................ 3,500
High School District ........................................................ 1,500
Unified District ............................................................... 5,000

(Cal. Admin. Code, tit. 5, § 18573.) The Plan states that attendance in Yorba Linda during the 1976-1977 school year was 2,511 in grades K-8, and 1,200 in grades 9-12, for a total of 3,711.

Fullerton HSD objects to the 3,711 figure because it refers to enrollment figures at the time the Plan was approved and not at the time the proposal becomes effective. Consequently, Fullerton HSD argues, the Plan is defective

[4]The State Board did not at first find the County Committee's findings on the racial segregation issue fully adequate. But the State Board received further evidence on the racial segregation issue, after which it adopted the Plan. On this issue it may be said that the State Board adopted the findings contained in the plan and in the addendum report of the State Department of Education.

[5]It should be emphasized that these administrative regulations are simply guidelines for the County Committee in the development of a plan. They do not diminish the State Board's authority to waive the criteria specified in subdivisions (a) through (e) of section 4200, if the State Board determines the circumstances present an exceptional situation sufficient to justify approval of the proposal. (See Cal. Admin. Code, tit. 5, § 18573, subd. (c).)

because it does not show that the proposed Yorba Linda Unified School District would have an enrollment of 5,000 in 1979-1980 when the Plan was intended to take effect. The evidence in fact shows that projected enrollment for 1979-1980 would be approximately 2,050 in grades K-8 and approximately 1,050 in grades 9-12, for a total enrollment of 3,100; Fullerton HSD urges that 3,100 is not substantial compliance with the guideline of 5,000.

Although the projected enrollment is less than specified in the guidelines, the State Board may well have determined, in the exercise of its discretion, that the relatively low enrollment should not deprive the Yorba Linda area residents of the opportunity to form a unified school district. Yorba Linda Elementary, although somewhat under-enrolled, already existed as a separate district. In view of the special geographic and community factors and of the fact that the relatively low enrollment is largely due to the preexisting elementary school district, we cannot say that the State Board acted arbitrarily in finding that the projected enrollment substantially met the guidelines for adequate enrollment.[6]

(c.) *Financial Ability*

At the time the Plan was approved, California Administrative Code, title 5, section 18573, subdivision (b)(2) provided that "Each district affected will be adequate in terms of financial ability if either the revenue limit per unit of average daily attendance of the proposed district does not vary from the revenue limit per unit of average daily attendance on the assessed valuation per unit of average daily attendance in all of the affected districts by more than 15%."[7]

Fullerton HSD argues that both the revenue limit per unit of average daily attendance (ADA) and the assessed valuation per ADA for the proposed Yorba Linda Unified School District vary by more than 15 percent from those for Fullerton HSD. The Plan shows that the assessed value per ADA varies by 29.42 percent. It also shows that the revenue limit per ADA deviates by only 5.27 percent, but Fullerton HSD points out that incorrect figures were used to arrive at that conclusion. It was inaccurate to determine the deviation of Yorba

---

[6]The California Administrative Code, title 5, section 18573, subdivision (b)(1) has since been amended to provide lower figures as guidelines for adequate enrollment, e.g., 901 for elementary districts, 301 for high school districts, and 1,501 for unified districts. These revised figures suggest that previous guidelines were found to be unreasonably high.

[7]Section 18573, subdivision (b)(2) has since been amended to read:

"(2) Each district affected will be adequate in terms of financial ability if:

"(A) The revenue limit per unit of average daily attendance of the proposed district does not vary from the revenue limit per unit of average daily attendance in all of the affected districts by more than 15%, or

"(B) The proposal does not increase costs to the State for the affected territory by more than 10%."

Linda Unified School District's revenue limit from the *average* revenue limit of Fullerton HSD *and* the elementary school districts within its boundaries. The deviation of the proposed Yorba Linda Unified School District revenue limit from the Fullerton HSD revenue limit—excluding the elementary school districts—in fact is 17.19 percent.[8]

The issue before us, however, is not whether the Plan conforms to the administrative guidelines. It is whether the State Board acted arbitrarily, capriciously, or without evidentiary support in concluding that the Plan substantially complied with the statutory requirements. Despite the deviation from the figures set by the administrative regulations, the record does not demonstrate that the State Board acted arbitrarily, capriciously, or without evidentiary support when it found that the proposed Yorba Linda Unified School District would have adequate financial ability to finance its educational program.[9]

(d.) *Division of Property*

The Plan proposes to appraise all real property, improvements, personal property and funds of Fullerton HSD and to divide the value of all such property on the basis of ADA ratio between the Yorba Linda portion and the remaining portion of Fullerton HSD. The real property and improvements will remain in that portion of the district in which they are located, but a monetary credit will be given to a portion of the district if the property located there was less than its proportional share based on ADA ratio. The Plan further divides bonded indebtedness of Fullerton HSD according to ADA ratio, but provides that one district may choose to accept a greater portion of the bonded indebtedness to offset charges against that district for an imbalance in real property, improvements or personal property received by that district.

Fullerton HSD complains that the Plan proposes an inequitable distribution of property in violation of section 4200, subdivision (d). Since section 4123 specifies that real property shall remain the property of the district in which it is located, it argues that the State Board should not

---

[8]This rather complex calculation was obtained by taking the 1976-1977 revenue limit for the Yorba Linda Elementary School District, extrapolating to determine the limit applicable if that district became a unified district, and comparing it with the revenue limit of the Fullerton HSD. Because the issue of the financial ability of the proposed unified district, although raised in the trial court and before the Court of Appeal, was not argued before this court, we avoid a detailed analysis of the calculation.

[9]Fullerton HSD further complains that the Plan fails to make any provision for the revenue limit of the proposed district as required by section 4364. To the contrary, the Plan proposes to establish a revenue limit for the new district at $1,439.35 for 1978-1979, the year prior to the year when the new district proposal was to become effective, and thus meets the requirements of section 4364.

take into account the value of real property. Section 4370, however, authorizes the County Committee in drafting the proposal for division of the property and funds to consider "the value and location of the school property." Moreover, section 4200 mandates an equitable division of the property and facilities of Fullerton HSD. If section 4123 were read to preclude any consideration of the value of the real property, the State Board would necessarily fail in its attempt to divide the property equitably.

Yorba Linda Unified School District, under the interpretation urged by Fullerton HSD, would receive the one parcel of land owned by Fullerton HSD located in the Yorba Linda area and a 7.8 percent share of funds. All other real property, all the improvements, and all the personal property of the district would remain with Fullerton HSD. Such a distribution would be manifestly inequitable. Thus, the State Board did not act arbitrarily or capriciously in approving the Plan's provision to divide the values of the property, even though the property itself remains in the portion of the district where it is located.

As to the bonded indebtedness, the Plan provides that one portion of the district may opt to accept a greater share of the bonded indebtedness than its proportional share in order to offset the amount owed, if any, on account of the division of the value of the other assets. Fullerton HSD contends that this provision of the Plan violates article XVI, section 18, of the California Constitution, which provides in pertinent part that: "No . . . board of education, or school district, shall incur any indebtedness . . . without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, . . ."

The answer to this argument is that the total amount of bonded indebtedness has already been voted on by the qualified voters of Fullerton HSD. ■ By a change of boundaries of a school district, the district does not lose its identity or cease to be the same legal entity it was before. (*Hughes* v. *Ewing, supra,* 93 Cal. 414, 419; see also *Bates* v. *Gregory* (1891) 89 Cal. 387, 395 [26 P. 891].) In any event, the Plan does not require that a nonpro rata distribution be made; Fullerton HSD is free to accept its proportional share of the bonded indebtedness only.

■ Finally, Fullerton HSD argues that the Plan does not provide for an equitable division of the property because the distribution of cash equivalent to Yorba Linda for Yorba Linda's proportional share of the real property and improvements would financially impoverish Fullerton HSD. Yorba Linda's proportional share of the property (7.8 percent based on ADA ratios) is estimated at $4 million. Fullerton HSD argues that, even if it assumed all the bonded in-

debtedness and gave Yorba Linda all the personal property, the balance owed to Yorba Linda would wipe out its liquid assets.

On the present record, the actual effect of the property division is quite uncertain, depending upon the values eventually assigned to the real property acquired by the new Yorba Linda District as against the value of that retained by the Fullerton HSD. If it turns out that the division imposes substantial burdens on Fullerton HSD, the two districts are free to make arrangements for payment that take account of the economic realities. All that the State Board did was to divide the property so that Yorba Linda would receive its proportional share of the district assets, and such a division clearly complies with the requirement of section 4200, subdivision (d), that the property be divided equitably.

(e.) *Racial or Ethnic Segregation*

Section 4200, subdivision (e), provides that a school reorganization plan must "not promote racial or ethnic discrimination or segregation." The State Board determined that the proposal at issue in this case met this criterion, but the trial court ruled to the contrary, finding that the Plan would promote segregation "by removing an area of primarily white students from an area that is increasingly becoming more integrated."

Statistics presented to the State Board and the trial court showed that in the 1976-1977 school year the Fullerton HSD had a white enrollment of 84.6 percent, and that the proposed Yorba Linda unified district would have a white enrollment of 91.6 percent. Fullerton HSD presented testimony predicting that minority enrollment in most of the Fullerton HSD would steadily increase, but that the racial and ethnic composition of Yorba Linda would remain relatively stable. Additional evidence presented to this court verified this prediction; as of November 1980 the white percentage in the Fullerton HSD as a whole has declined to 80 percent, but that of Yorba Linda only to 90.9 percent.[10] If Yorba Linda seceded from the Fullerton HSD, the remaining portion of the district would have a white percentage of 66 percent.

The statutory language, that the proposal must not "promote racial or ethnic discrimination or segregation," has not received judicial definition. We believe it imposes on the State Board a more stringent obligation than its constitutional duty—a duty which would exist in the absence of section 4200—not to approve

---

[10]On June 17, 1981, we granted the motion of Fullerton HSD to produce additional evidence, and admitted into evidence the declaration of James Bremmer. The additional evidence consists primarily of 1979 and 1980 enrollment figures, the accuracy of which is not disputed.

the creation of a district with segregated schools.[11] The State Board should also inquire into the effect of a secession Plan upon the ability of both the new district and the remaining portion of the original district to adapt to the present and anticipated racial and ethnic composition of its students, and to implement voluntary integration programs (cf. *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 294; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 951-952 [92 Cal.Rptr. 309, 479 P.2d 669]).

Measured against this view of the statutory purpose of section 4200, the decision of the State Board is questionable. The Plan will carve out from an increasingly integrated district a small enclave which is, and will remain, 90 percent white.[12] Although we do not question the motives of those who propose the Plan, many in the area may see it as an attempt to isolate the white students of Yorba Linda from contact with a significant number of minority students. Any future efforts of Yorba Linda school district to obtain a more racially balanced student body, and to avoid community identification as a "white" high school, will likely be frustrated by small size and stable demography of the area. Moreover, the removal of the stable white enrollment from Yorba Linda will make it more difficult for Fullerton HSD to adapt to a changing racial and ethnic population, which difficulty may eventually result in some schools in that district becoming predominantly minority schools.

---

[11]In *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280, 303-304 [130 Cal.Rptr. 724, 551 P.2d 28], we stated that "[I]n determining whether a particular school is 'segregated' . . . , we do not believe set racial and ethnic percentages can be established, either in absolute terms or in terms of the racial composition of a particular district's student population. Under the California Constitution, as under the federal Constitution '[w]hat is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff[,] and the community and administration attitudes toward the school, must be taken into consideration.' [Citation omitted.] As the United States Supreme Court explained . . . : 'Independent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights . . . is shown.' [Citation omitted.]"

Since the proposed Yorba Linda High School has not been constructed, we have no information concerning its staff, facilities or programs, and cannot determine whether the community will view that school as a white, segregated institution. We likewise lack information as to how the secession of Yorba Linda will affect individual schools remaining in Fullerton HSD. Consequently, we cannot predict whether the Plan will actually result in segregated schools in either Yorba Linda or the balance of the Fullerton HSD.

[12]Two United States Supreme Court decisions hold that division of a school district to maintain a racially identifiable white school violates the Fourteenth Amendment. *(United States* v. *Scotland Neck Bd. of Education* (1972) 407 U.S. 484 [33 L.Ed.2d 75, 92 S.Ct. 2214]; *Wright* v. *Council of City of Emporia* (1972) 407 U.S. 451 [33 L.Ed.2d 51, 92 S.Ct. 2196].) Although both cases are factually distinguishable from the present litigation—they involved the division of a previously de jure segregated system to ensure that the designated white school retained a large proportion of white students—these cases demonstrate that division of an integrated district to fence off white students constitutes illegal segregation.

As we have said, however, the issue before us is limited to whether the State Board acted arbitrarily, capriciously, or without evidentiary support. This standard severely limits the scope of our review. The State Board's finding is supported by evidence that both Yorba Linda and the remaining portion of the Fullerton HSD are presently predominantly white; if we look to the present composition of the districts and dismiss future changes as speculative, we could not classify the State Board's decision as arbitrary or capricious. We therefore uphold the State Board's finding on this issue.

3. *Compliance with the California Environmental Quality Act.*

■ Under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21050 et seq.), any public agency directly undertaking a project which may have a significant effect on the environment must first conduct a threshold study of such impact. If the study shows that the project will not have a significant effect, the agency may so declare in a brief negative declaration; if it demonstrates that the project may have a significant effect, the agency must prepare an environment impact report. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].)

■ Implementation of the secession Plan in the present case involves the possibility of a significant impact. Secession will likely require the construction of a new high school in Yorba Linda and may result in abandonment of some facilities in the remaining portion of the Fullerton HSD.[13] It will change bus routes and schedules, and affect traffic patterns. Although it is uncertain whether the total impact will be significant enough to require an environmental impact report, it is clear that it is sufficient to require at least an initial study to inquire into the need for such a report.

The State Board, however, ruled that it had no duty to undertake such a study before approving the Plan. Judicial review of its ruling is governed by Public Resources Code section 21168.5, which limits judicial inquiry into "whether there was a prejudicial abuse of discretion," and provides that "[a]buse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."[14] In the present case, the principal controversy concerns whether

---

[13]The new district will be required to devise a plan to house students in grades 9-12. It is currently estimated that it will cost in excess of $6 million to construct the necessary facilities. The trial court also relied upon testimony to the effect that the proposed plan would cause a reduction in the number of students in the Fullerton HSD which would necessitate either the inefficient use of the Fullerton HSD facilities or the closing of some of its facilities.

[14]The question here is not merely whether the State Board's determination was arbitrary, capricious or entirely lacking in evidentiary support. (Cf. *Brock* v. *Superior Court, supra,* 109 Cal.App.2d 594.) Rather, the standard of review applicable under CEQA is a much more

the State Board's approval of the Plan constitutes a "project" within the purview of CEQA.[15] This is an issue of law which can be decided on undisputed data in the record on appeal; thus the present appeal presents no question of deference to agency discretion or review of substantiality of evidence.

We explained CEQA's concept of a "project" requiring an environmental study in *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017]. *Bozung* was concerned with a Local Agency Formation Commission (LAFCO) decision to approve an annexation proposal. The commission argued that although the development of the land following annexation might have an environmental effect, the mere approval of the proposal had no such effect. We explained, however, that "[t]he notion that the project itself must directly have such an effect was effectively scotched in *Friends of Mammoth.* [*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 (104 Cal.Rptr. 761, 502, P.2d 1049).] The granting of a conditional use permit—a piece of paper—does not directly affect the environment any more than an annexation approval—another piece of paper. *Friends of Mammoth,* of course, said that the word "project" appears to emphasize activities *culminating* in physical changes to the environment, . . .' (*Id.,* at p. 265. Italics added.) In response to that concept, the Guidelines refer to 'physical impact on the environment, directly or *ultimately.*' (Cal. Admin. Code, tit. 14, § 15037. Italics added.)" (13 Cal.3d at p. 279.) We then held in *Bozung* that approval of the annexation—a necessary step in a chain of events which would culminate in physical impact on the environment—required an environmental impact report.

The State Board, consequently, cannot argue that its approval of the secession Plan is not a project merely because further decisions must be made before schools are actually constructed, bus routes changed, and pupils reassigned. It does, however, argue that its approval is not a project because it simply submits the issue to the voters, and because the Plan as approved is not sufficiently definite to allow an adequate environmental study.

stringent inquiry as to whether there was a prejudicial abuse of the State Board's discretion. Such an abuse of discretion may be established by showing that the State Board incorrectly assessed, and thus did not comply with, the proper procedure "required by law." (Pub. Resources Code, § 21168.5)

[15]The State Board also argues that the County Committee was the lead agency responsible for preparation of the threshold study, and consequently that Fullerton HSD's suit, because it was not filed within 180 days from the County Committee's action, was barred by the statute of limitations. (See Pub. Resources Code, § 21167.) CEQA defines "lead agency" as "the public agency which has the principal responsibililty for carrying out or approving a project." (Pub. Resources Code, § 21067.) Consequently, assuming that the environmental study should take place before the election—an issue discussed later in this opinion—the role of lead agency in our opinion falls on the State Board. Even though the County Committee formulated the Plan, the State Board had the final responsibility to review the Plan, approve it, and submit it to the voters. Since Fullerton HSD brought the present action within 180 days after the State Board's approval, its action was timely.

The State Board first points to California Administative Code, title 14, section 15037, which in subdivision (b) states that "[p]roject does not include . . . (4) The submittal of proposals to a vote of the people of the State or of a particular community."

It is clear, however, that Board's approval of the Plan is not exempt from CEQA merely because that approval must be ratified by the voters. As the court explained in *People* ex rel. *Younger* v. *Local Agency Formation Com.* (1978) 81 Cal.App.3d 464 [146 Cal.Rptr. 400], in holding LAFCO approval of a deannexation proposal was subject to CEQA, "[t]he 'project' here is more than the 'submittal of proposals to a vote of the people.' Rather, it is but the first step required by statute on a deannexation proposal with consequent substantial impact on the physical and human environment." (81 Cal.App.3d at p. 479.)

The State Board also relies on *Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com.* (1975) 51 Cal.App.3d 648 [124 Cal.Rptr. 635], which concerned LAFCO approval of an election to detach an area from a recreation and park district. Noting that the asserted environmental impact was simply the replacement of one group of managers by others who might hold different views on the future use of the land in question, the court held that under these circumstances the LAFCO approval was not a "project" under CEQA. Distinguishing *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, *Simi Valley* stated that the earlier case "dealt only with the situation where LAFCO approval was a necessary step in the development and in effect constituted an entitlement for use for such development. . . . [¶] The evaluation process contemplated by CEQA relates to the effect of proposed changes in the physical world which a public agency is about to either make, authorize or fund, not to every change of organization or personnel which may affect future determinations relating to the environment." (51 Cal.App.3d at pp. 665-666.)[16]

The distinction set out in *Simi Valley* is not between approval of a proposal which requires an election and approval of a proposal which does not. It is be-

---

[16]The quoted language from *Simi Valley* is not, of course, a test for determining whether governmental action comes under CEQA. The concept of "project" in CEQA encompasses many activities which do not relate to land development, but involve some other environmental impact. (See, e.g., *Edna Valley Assn.* v. *San Luis Obispo County etc. Coordinating Council* (1977) 67 Cal.App.3d 444 [136 Cal.Rptr. 665] [approval of regional transportation plan]; *Shawn* v. *Golden Gate Bridge etc. Dist.* (1976) 60 Cal.App.3d 699 [131 Cal.Rptr. 867] [increase in bridge tolls].)

The decision in *Prentiss* v. *Board of Education* (1980) 111 Cal.App.3d 847 [169 Cal.Rptr. 5], that the closure of a school is not a "project" because the school board had not decided whether to put the land to a different use, is questionable. It may be unlikely that the closure of a single elementary school would have a significant environmental impact apart from its effect on the use of the property—the school board in *Prentiss* filed a negative declaration—but the possibility cannot be rejected categorically.

tween governmental approval which constitutes an essential step culminating in action which may affect the environment (*Bozung*) and approval of a reorganization which portends no particular action affecting the environment (*Simi Valley*).

The present case more closely resembles *Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d 263. The anticipated environmental impact here stems from the construction of a new high school in Yorba Linda and consequent changes in the remaining portion of the Fullerton HSD. Although it is conceivable that Fullerton HSD itself could build a high school in Yorba Linda, it is apparent that it does not intend to do so; the future Yorba Linda Unified School District, on the other hand, must construct such a facility. Thus, as a practical matter State Board approval of the secession Plan is an essential step leading to ultimate environmental impact; it is therefore under the reasoning of *Bozung* and *Simi Valley* a "project" within the scope of CEQA. (See *People* ex rel. *Younger* v. *Local Agency Formation Com.*, *supra*, 81 Cal.App.3d 464, 478.)

A closer question is presented by the State Board's contention that an environmental study before the election would be premature. The timing of an environmental study can present a delicate problem. " 'Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.' " (*No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d 68, 77 fn. 5, quoting *Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n.* (D.C.Cir. 1973) 481 F.2d 1079, 1094.)

Specific plans have not yet been formulated for construction of a new high school in Yorba Linda or for changes in the education program in the remaining portion of the Fullerton HSD. Thus delay of an environmental study until after the election might result in a more specific and useful study. The problem with such a delay, however, is that as a practical matter it precludes the alternative of continuing the status quo. Once the voters approve the secession Plan the new Yorba Linda Unified School District will have to build a high school, and Fullerton HSD will have to adjust to the loss of the Yorba Linda students.

The fundamental purpose of CEQA is to ensure "that environmental considerations play a significant role in governmental decision-making" (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049]). Consequently, it is desirable that environmental information be furnished the decision-maker "at the earliest possible stage" (*Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d 263, 282).

■ In the present setting, the State Board and the voters are the decision-makers; they must decide whether to approve the proposed secession, an approval which necessarily entails building a new high school and other actions which may have an environmental effect. In making that decision, the State Board and the voters should have the benefit of relevant environmental data and analysis. (See *People* ex rel. *Younger* v. *Local Agency Formation Com.*, *supra*, 81 Cal.App.3d 464, 481.)[17] We conclude that the initial environmental study of the effect of detaching Yorba Linda from the Fullerton HSD should have been undertaken before the State Board approved the Plan and submitted it to the voters, and that in failing to undertake that study the State board violated the requirements of CEQA.[18]

*4. Limitation of the election to residents of Yorba Linda.*

■ Fullerton HSD contends that the decision of the State Board to approve limiting the election to residents of Yorba Linda denies the equal protection of the laws to the other residents of Fullerton HSD.

The first step in evaluating this contention is to determine the applicable level of judicial review.[19] In *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942 [104 Cal.Rptr. 297, 501 P.2d 537], a voting rights case similar in many respects to the present case, we explained that: "[T]his court and the United States Supreme Court apply a two-level test. [Citation.] In the typical equal protection

[17]The decision of the District of Columbia Circuit in *Realty Income Trust* v. *Eckerd* (D.C. Cir. 1977) 564 F.2d 447, presents an analogy to the present case. The court there held that an environmental study must precede submission of a proposal to Congress for construction of a new federal office building even though the exact site and financing would be determined by the General Services Administration following congressional approval. By submitting an environmental impact statement (EIS) with the proposal, the agency would make available environmental information at the "critical juncture" when the relevant congressional committees decide "whether to proceed with these projects at all." (P. 453.)

The court went on to say that "the interest of Congress in making environmentally-informed decisions is not the only interest at stake in the timely filing of an EIS . . . . There is also the interest . . . in seeing that the agency itself has considered the environmental issues in this important stage in the decision-making process. [Citation.] Finally, the availability of an EIS can allow for a more informed and more effective involvement by the public . . . ." (Pp. 453-454.)

[18]We emphasize that we require only an initial threshold study. The result of that study will determine whether an environmental impact report is necessary.

[19]Some decisions speak of an initial constitutional inquiry to determine whether the groups affected are similarly situated with respect to the purpose of the legislation or other state action. (See, e.g., *In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 317, 601 P.2d 549].) To ask whether two groups are similarly situated in this context, however, is the same as asking whether the distinction between them can be justified under the appropriate test of equal protection. Obvious dissimilarities between groups will not justify a classification which fails strict scrutiny (if that test is applicable) or lacks a rational relationship to the legislative purpose. (See, e.g., *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375] (adults and minors); *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705 [139 Cal.Rptr. 620, 566 P.2d 254] (felons and misdemeanants).)

case the classification need only bear a rational relationship to a conceivable legitimate state purpose; '[on] the other hand, in cases involving "suspect classifications" or touching on "fundamental interest," . . . the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations omitted.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.'" (7 Cal.3d at pp. 951-952, quoting *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].)

In *Hawn* v. *County of Ventura* (1977) 73 Cal.App.3d 1009, 1019-1020 [141 Cal.Rptr. 111], the Court of Appeal explained the application of these principles to state action limiting the franchise: "[T]he strict standard of review has long been held to apply to voting legislation which excludes certain potential voters from participation. (*Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; *Curtis* v. *Board of Supervisors* [*supra*] 7 Cal.3d 942.) There has been a subsequent refinement of this general principle as it applies to analysis of legislative voting classifications: an exclusion of voters invoking strict constitutional scrutiny has been held to mean an 'identifiable class' of voters (*Weber* v. *City Council* (1973) 9 Cal.3d 950 [109 Cal.Rptr. 553, 513 P.2d 601]; *Gordon* v. *Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889]) and, '[a]lthough not every classification created . . . is subject to strict scrutiny, the "compelling interest" measure must be applied if a classification has a "real and appreciable impact" upon the equality, fairness and integrity of the electoral process.' (*Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438]; see *Bullock* v. *Carter* (1972) 405 U.S. 134, 144 [31 L.Ed.2d 92, 92 S.Ct. 849].) For a legislative classification relating to the elective process to *avoid* the strict scrutiny test of equal protection, it must have 'only minimal, if any, effect on the fundamental right to vote.' (*Gould* [v. *Grubb* (1975)] 14 Cal.3d 661, 670 [122 Cal.Rptr. 377, 536 P.2d 1337].)" It is important to note that it is the impact of the classification on the electoral process that triggers strict scrutiny. That heightened mode of analysis is not limited to cases involving suspect or invidious classifications.

It is clear that the classification in the present case does not involve a mere incidental or marginal effect on a fundamental right (compare *Califano* v. *Jobst* (1977) 434 U.S. 47, 53-54 [54 L.Ed.2d 228, 234-235, 98 S.Ct. 95]; *In re Flodilin* (1979) 25 Cal.3d 561, 568 [159 Cal.Rptr. 327, 601 P.2d 559]); it excludes all residents of Fullerton HSD outside Yorba Linda from voting on the proposed measure, an exclusion which may well affect the outcome of the election. The case is thus analogous to those Supreme Court decisions (*Phoenix* v.

*Kolodziesjki* (1970) 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990]; *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. [1886]) which have applied strict scrutiny to invalidate restrictions on the franchise in municipal and school district elections, and to our decision in *Curtis* v. *Board of Supervisors, supra,* 7 Cal.3d 942, applying that test to an election to incorporate a city.

The State Board, however, contends that geographical classifications constitute an exception to the rule, that exclusion of voters because of their place or residence requires strict scrutiny only if the exclusion serves some impermissible end such as racial discrimination (see *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125]). They rely for this proposition on two decisions of the United States Supreme Court, *Lockport* v *Citizens for Community Action* (1977) 430 U.S. 259 [51 L.Ed.2d 313, 97 S.Ct. 1047], and *Holt Civic Club* v. *Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 99 S.Ct. 383]. As we shall explain, the exception established by those cases is not as broad as the State Board claims—and not broad enough to permit the classification at issue here to escape strict scrutiny.

*Lockport* upheld a New York law requiring that adoption of a new county charter be approved by separate majorities of city and noncity residents.[20] When a proposed charter was approved by a majority of city residents, but defeated by the less numerous noncity residents, proponents of the charter claimed the statute violated the one-man, one-vote principles by giving noncity voters an excessive voice.

The court, however, noted that one-man, one-vote principles had little application to a single-issue referendum since the state could "determine whether its adoption or rejection will have a disproportionate impact on an identifiable group of voters" (p. 266 [51 L.Ed.2d at p. 321]) and shape its election requirements accordingly. The court observed that if city and noncity voters had identical interests in the adoption or rejection of the charter, "any distinction . . . between voters drawn on the basis of residence" would be unconstitutional. (P. 268 [51 L.Ed.2d at p. 322].) Conversely, if the interests of one group far outweighed the other, the court implied that the state could limit the franchise to the former group. (See p. 266 [51 L.Ed.2d at p. 321], citing *Salyer Land Co.* v. *Tulare Water District* (1973) 410 U.S. 719 [35 L.Ed.2d 659, 93 S.Ct. 1224].) The challenged statute in *Lockport,* however, presented an in-

[20]*Lockport* is essentially the counterpart of an earlier United States Supreme Court decision, *Hunter* v. *Pittsburgh* (1907) 207 U.S. 161 [52 L.Ed. 151, 28 S.Ct. 40]. *Hunter,* which involved a proposed merger of two cities, held that the state need not require approval by concurrent majorities; *Lockport,* that the state need not aggregate the vote from areas of differing interests. Together, they demonstrate the discretion enjoyed by the state in deciding whether to total all votes together or to insist on approval from each affected locality. Neither case involved denial of the franchise to any person residing within any affected locality.

termediate situation: city and noncity residents each had substantial but different interests in the controversy.

Such differences, the court held, justified the state's decision to require concurrent majorities of city and noncity residents. The court explained that if the constitutional ". . . question were posed in the context of annexation proceedings, the fact that the residents of the annexing city and the residents of the area to be annexed formed sufficiently different constituencies with sufficiently different interests could be readily perceived. The fact of impending union alone would not so merge them into one community of interest as constitutionally to require that their votes be aggregated in any referendum to approve annexation. Cf. *Hunter* v. *Pittsburgh,* 207 U.S. 161. Similarly, a proposal that several school districts join to form a consolidated unit could surely be subject to voter approval in each constituent school district. [¶] . . . [I]n terms of recognizing constituencies with separate and potentially opposing interests, the structural decision to annex or consolidate is similar in impact to the decision to restructure county government in New York. In each case, separate voter approval requirements are based on the perception that the real and long-term impact of a restructuring of local government is felt quite differently by the different county constituent units that in a sense compete to provide similar governmental services. Voters in these constituent units are directly and differentially affected by the restructuring of county government, which may make the provider of public services more remote and less subject to the voters' individual influence. [¶] The provisions of New York law here in question no more than recognize the realities of these substantially differing electoral interests. Granting to these provisions the presumption of constitutionality to which every duly enacted state and federal law is entitled, we are unable to conclude that they violate the Equal Protection Clause of the Fourteenth Amendment." (Fn. omitted; 430 U.S., at pp. 271-272 [51 L.Ed.2d, at pp. 324-325].)

The quoted language from *Lockport* makes it clear that the state can recognize that residents of different areas may have different interests and, in a single-issue referendum, can constitutionally require concurrent majorities. But nothing in *Lockport* endorses measures which deny the vote entirely to residents of one of the areas, nor permits such measures to escape strict judicial scrutiny.

This reading of *Lockport* gains support from the only California decision relating to geographical limits on voting rights. In *Hawn* v. *County of Ventura, supra,* 73 Cal.App.3d 1009, the county enacted an ordinance providing that any decision to establish a county airport located in whole or *in part* within an incorporated city must be approved by a majority of *city* voters. The county undertook to acquire a former Air Force base located partially within the City of Camarillo and partially beyond the city limits. The Court of Appeal applied

strict scrutiny to the ordinance limiting the franchise to city residents and, finding both city and county residents directly interested in the issue of airport location, held the restricted franchise invalid.

Distinguishing the *Lockport* decision, the Court of Appeal observed that "[i]t is readily apparent that the New York law involved in *Lockport* is quite different from the airport initiative ordinance before us. *Lockport* did not deal with a statute which excluded voters based on residence. On the contrary, the statute in *Lockport* gave equal recognition to the interests of the noncity voters in a new county charter as it did to the interests of the city voters. The rationale of *Lockport* lends support to the contention that the airport ordinance before us constitutes an invidious discrimination against noncity residents and voters of Ventura County . . . ." (P. 1021.)

We conclude that *Lockport* does not support the proposition that geographical restrictions on the franchise are immune from strict scrutiny. We therefore turn to the second case relied on by the State Board, *Holt Civic Club* v. *Tuscaloosa, supra,* 439 U.S. 60. That case concerned Alabama statutes which permitted cities to extend their police regulation and licensing authority to unincorporated areas within three miles of the city limits. Nonresidents, however, were immune from city taxes (except business licenses, charged at one-half the rate assessed within the city limits), city zoning authority, and many other powers of city government. Although appellants, who lived within the three-mile area beyond the city limits, did not directly seek the right to vote in municipal elections, they claimed that because they were denied the vote the city's exercise of extraterritorial jurisdiction was unconstitutional.

The court reviewed the voting rights cases in which it had applied strict scrutiny, and noted that the cases involved a common characteristic: "The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned." (P. 68 [58 L.Ed.2d at p. 300].) The geographic entity involved in the case at hand was the City of Tuscaloosa, and since the statute did not deny the vote to anyone within that line, strict scrutiny was not required; "[t]he line . . . marked by this Court's voting qualifications decisions coincides with the geographical boundary of the governmental unit at issue, and we hold that appellants' case, like their homes, falls on the farther side." (P. 70 [58 L.Ed.2d at p. 302].) Applying a less rigorous test—whether the state plan bore a rational relationship to a legitimate state purpose—the court upheld the challenged statutes.

The State Board reads *Holt* as holding that geographical distinctions, unlike all other voting classifications, never require strict scrutiny. We read the case

differently. In our view, it holds only that distinctions which coincide with the boundaries of the governmental entity concerned, and exclude no one physically resident within those boundaries, do not require strict scrutiny. If, on the other hand, the state attempts to carve up the existing political entity and deny the vote to some of its residents—if, for example, in *Holt* the statute had denied the vote to some persons who lived within the Tuscaloosa city limits—then strict scrutiny is still required.

Accordingly, we cannot avoid the requirement of strict scrutiny on the ground that the decision in question here imposes geographical restrictions on voting rather than the property or residency limitations examined in prior cases. Instead, we must determine the constitutionally relevant boundaries, "the geographic boundaries of the governmental entity concerned" (*Holt Civic Club* v. *Tuscaloosa, supra,* 439 U.S. at p. 68 [58 L.Ed.2d at p. 300]), and subject to strict scrutiny any measure which limits voting within those boundaries.

In the present case, the State Board could argue that Yorba Linda, not the Fullerton HSD, is the relevant geographic area, and that the exclusion of voters outside Yorba Linda thus is not subject to strict scrutiny. The Fullerton HSD, however, is not merely a neighboring district incidentally affected by the secession of Yorba Linda, but the existing entity with legal authority over high school education in Yorba Linda; the impact of the secession is in large part the consequence of the present status and authority of the Fullerton district. For example, under the plan approved by the State Board, Fullerton HSD may incur a substantial debt to the new Yorba Linda Unified School District, a debt which will have to be paid by the residents remaining in the Fullerton HSD. Moreover, having built and staffed a high school to educate the children of Yorba Linda, among others, the withdrawal of Yorba Linda will leave the district with excess capacity and affect its educational programs. None of these effects affect neighboring districts; the impact on the Fullerton HSD and its residents is unique. We conclude that the entire present Fullerton HSD is the relevant geographic area for the purpose of applying constitutional requirements of equal protection.[21]

The State Board relies primarily on another exception to the requirement for strict scrutiny—that in an election involving a special district of limited powers whose activities disproportionately affect members of a particular group, a measure limiting the franchise to that group does not encounter strict scrutiny. The State Board relies in particular on *Salyer Land Co.* v. *Tulare Water*

---

[21]Note, *The Right to Vote in Municipal Annexations* (1975) 88 Harv.L.Rev. 1571 discusses an analogous issue—whether residents of a "source city" may be denied the right to vote in an election to approve a proposal to detach a portion of that city and annex it to another city. The note concludes that any measure denying the vote to source city residents outside the area to be detached must meet the strict scrutiny standard. (Pp. 1585-1587.)

*District, supra,* 410 U.S. 719, the leading case establishing this exception to the strict scrutiny requirement.

*Salyer* upheld a franchise restricted to landowners for the election of directors of a water storage district. The decision relied on the limited powers of the district, the disproportionate effect of its activities on landowners as a group, and the financing of district activities solely by levies on the landowners. California courts have applied a similar analysis to elections concerning a recreation and park district (*Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com., supra,* 51 Cal.App.3d 648), a reclamation district (*Philippart* v. *Hotchkiss Tract Reclamation Dist. 799* (1976) 54 Cal.App.3d 797 [127 Cal.Rptr. 42]) and a small irrigation district (*Schindler* v. *Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831 [82 Cal.Rptr. 61]).

Our decision in *Choudhry* v. *Free, supra,* 17 Cal.3d 660, explored the limits of this exception. *Choudry* concerned a statute which required that directors of the Imperial Irrigation District be freeholders. The opinion noted the size of the district—the largest irrigation district in the state—its substantial payroll, its power to acquire and operate electrical power and flood control facilities, and its ability to finance operations through charges for such services. Distinguishing *Salyer* by virtue of the larger size and impact on nonlandowners of the Imperial Irrigation District, the court held that the restriction must be tested by a standard of strict scrutiny.

Mindful of the broad powers possessed by school districts, and the impact of district actions upon the life of the community, courts have consistently applied the same standards to school district elections as they apply to municipal and state elections. In *Kramer* v. *Union School District, supra,* 395 U.S. 621, which involved a statute limiting the franchise in school board elelctions, the Supreme Court stated that the " 'alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.' " (P. 626 [23 L.Ed.2d at p. 589], quoting *Reynolds* v. *Sims* (1964) 377 U.S. 533, 562 [12 L.Ed.2d 506, 527, 84 S.Ct. 1362].) Our decision in *Curtis* v. *Board of Supervisors, supra,* 7 Cal.3d 942, reviewed *Kramer* and other high court decisions, and concluded that the standards established in those cases, including strict judicial scrutiny of voting restrictions, applied to "the government of [the] state, city, county, *school district,* and other agencies of general governmental power." (P. 960). (Italics added.)

We note in particular the decision of the United States Supreme Court in *Hadley* v. *Junior College District* (1970) 397 U.S. 50 [25 L.Ed. 2d 45, 90 S.Ct. 791], which held that the "one man, one vote" requirement applied in an election of trustees of a junior college district. The opinion explained that "It is

of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with [the one man, one vote requirement] might not be required, but certainly we see nothing in the present case that indicates that the activities of these trustees fit in that category. Education has traditionally been a vital governmental function, and these trustees . . . are governmental officials in every relevant sense of that term." (P. 56 [25 L.Ed.2d at p. 51].) In *Salyer Land Co.* v. *Tulare Water District, supra,* 410 U.S. 719, the court quoted the foregoing language from *Hadley* to justify its decision upholding a limited franchise in a water district election. (Pp. 727-728 [35 L.Ed.2d at pp. 665-666].) Thus it appears that *Salyer,* the precedent on which the State Board relies, itself recognizes that school district elections do not fall within the *Salyer* exception for districts of limited authority and impact.

We conclude that the decision of the State Board is subject to strict judicial scrutiny, and cannot be sustained unless justified by a compelling state interest. The State Board, in defense of that decision, argues that the residents of Yorba Linda have a greater interest in the question of establishing a separate high school district in that community, but that their preference might be swamped by the "selfish" vote of the less interested, but more numerous, residents of the remaining Fullerton HSD. The State Board does not explicitly claim that justification constitutes a compelling state interest, but it is nevertheless our task to inquire into that matter.

 It is, of course, clear that the state cannot claim a compelling interest in excluding voters because of how they may vote. (*Carrington* v. *Rash* (1965) 380 U.S. 89, 94 [13 L.Ed.2d 675, 679, 85 S.Ct. 775].) To the extent that the State Board seeks to exclude some Fullerton voters because their vote might defeat the proposed secession, the State Board's justification is constitutionally impermissible. If we rephrase the justification, however, as one of excluding uninterested voters in order to protect the interests of persons vitally concerned, we encounter a state interest which might, in an appropriate case, achieve compelling character.

This is not such a case. Without denigrating the interests of Yorba Linda residents, it is nonetheless apparent that the remaining Fullerton HSD residents also have a substantial interest in the election. As we noted earlier, the secession will affect the present and future racial composition of the Fullerton HSD, and may make it more difficult for the district to cope with an increasing number of minority students. We also note that the Plan approved by the State Board may impose a substantial debt on the Fullerton HSD which might require stringent economies or a tax increase. Although neither consideration is, in our

opinion, enough in itself to compel us to overturn the State Board's approval of the secession proposal, the racial and financial impact of that Plan are matters of great concern to the residents who will remain in the Fullerton HSD. The record further indicates that the withdrawal of the Yorba Linda students from Troy High School in Fullerton May necessitate closing that school, or at least a substantial curtailment of its facilities and curriculum. Such measures will seriously affect the quality of education offered by the Fullerton HSD, as well as the financial burden on its residents.[22]

In sum, we do not view the clasification at issue here as one which separates interested and uninterested voters, but one which divides two groups, each with a substantial although different interest in the election. In such a case the state has no compelling interest to grant the franchise to one group and deny it to the other. We therefore conclude that the decision of the State Board, to the extent that it excluded Fullerton HSD residents from voting at the election to approve the proposed secession of Yorba Linda from the Fullerton HSD, denied such residents the equal protection of the laws.

### 5. *Conclusions respecting the trial court judgement.*

Having found that the State Board's approval of the Plan violated Education Code section 4200, the trial court issued mandate prohibiting state and local officials from taking any action whatsoever on the secession Plan. Since we conclude that the Board's approval of the Plan was not arbitrary, capricious, or unsupported by evidence, we cannot agree with the trial court's order barring any further action. The State Board, in our opinion, may proceed to consider the Plan, so long as it conforms to the requirements of CEQA and does not exclude any Fullerton HSD residents from voting in any election to approve the Plan.

The trial court further prohibited the relevant officials "from calling, noticing, or conducting an election on March 7, 1978, or at any other time whatsoever" for the purposes of submitting the Plan to the voters. This portion of the order below is overbroad, and should be modified to prohibit only an election limited to the residents of less than the entire Fullerton HSD.

Finally, the trial court directed the State Board to vacate its approval of the Plan and prohibited any election conducted before the State Board had complied with the requirements of CEQA. Compliance with CEQA, however, is re-

---

[22]The trial judge adopted findings drafted by counsel to the effect that the Plan would promote racial segregation, interfere with the quality of programs offered by the Fullerton HSD, and may have a significant environmental impact. To each of these findings, the judge added in his own handwriting the words "the entire Fullerton District should vote on the Plan." We share the view of the trial judge; the racial, financial, and environmental effect of the Plan require a vote open to all residents of the Fullerton HSD.

quired not only before an election takes place, but before the State Board grants final approval to the Plan. (See Pub. Resources Code, § 21050.) The judgment should be modified accordingly.

The judgment of the superior court is reversed and the cause remanded with directions to modify the judgment in conformity with the views expressed herein. Since the modified judgment will afford Fullerton HSD substantially the relief it seeks, it shall recover its costs on appeal.

Bird, C. J., and Mosk, J., concurred.

NEWMAN, J.—I concur in the judgment reluctantly. I have signed the concurring opinion of Kaus, J. in *Citizens Against Forced Annexation* v. *Local Agency Formation Com.* (1982) *post,* page 816 [187 Cal.Rptr. 423, 654 P.2d 193], also filed today. I agree with him that the state rationally may arrange a special-issue election to prevent the vote of a smaller, vitally concerned geographic group from being overwhelmed by the contrary ballot of a larger population with interests manifestly more diffuse. In my view, the state's decision to do so need not invoke "strict scrutiny review."

The lead opinion in *Citizens* is contra. ██ Acknowledging that fact, I acquiesce in the determination here that an election involving the entire Fullerton District is necessary.

My second concern relates to the deference that the plurality here have accorded the Board of Education's view that Yorba Linda's departure from the Fullerton District will not "promote racial or ethnic discrimination or segregation. . . ." (Ed. Code, § 4200, subd. (e).) As my dissent in *McKinny* v. *Board of Trustees* (1982) 31 Cal.3d 79 [181 Cal.Rptr. 549, 642 P.2d 460] argued, the role of courts when they review racially sensitive fact finding by school agencies should not depend on whether "quasi-legislative" or "quasi-judicial" proceedings are involved (*McKinny,* pp.103-104). Under *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr, 724, 551 P.2d 28], the courts may defer to an agency's judgment only when it shows a commitment to "meaningful progress" toward ending segregation and to "all reasonable and feasible steps" in that direction. Judicial responsibility should, I believe, include special scrutiny of administrative findings that no segregation exists or that a proposed decision will have no discriminatory or segregative impact.

My colleagues seem to have concluded otherwise (*McKinny, supra,* 31 Cal.3d at p. 88). ██ Therefore, again because of *stare decisis,* I bow to the conclusion that the board's finding here has adequate support.

KAUS, J., (2b), (3b), (4b), (5b), (6c), (8c), (9b), (10c)—Concurring and Dissenting.—I agree with the majority that the State Board of Education substantially complied with section 4200 of the Education Code in adopting the school district reorganization plan, but that under the California Environmental Quality Act it should have conducted an initial environmental review of the effects of the plan—at least to determine whether a "negative declaration" was warranted—before giving final approval to the proposal. Accordingly, I concur in the portion of the judgment remanding the matter to the board for such an environmental review. I dissent, however, from the majority's conclusion that the reorganization procedure at issue violates the equal protection clause because it limits the right to vote on the reorganization plan to those persons who reside in the proposed new district.[1]

Proposals for the alteration of municipal boundary lines or the reorganization of local political entities frequently pit the interests of those residents who will be most directly affected by the change—the residents of the area that may be annexed to, or severed from, an existing municipality or district—against the interests of the current residents of the annexing entity or of the remaining residents of the entity that may lose some of its constituents. There are many ways a state may choose to resolve these conflicting interests to ensure that school district and municipal boundary lines are established on a logical, well-planned basis that serves the interests of the region as a whole, as well as the interests of the most immediately affected entities. Under the procedures that are challenged in this case—and in the companion *Citizens* case (see fn. 1, *ante*) —this state has simply provided that once a reorganization proposal has been adopted by the proper regional or statewide planning agency, the reorganization can take effect if it is approved by a majority of those persons most directly affected by the plan, i.e., the residents who live in the area that is to be annexed

---

[1]My differences with the majority's equal protection analysis extend as well to the majority's reasoning in the companion case of *Citizens Against Forced Annexation* v. *Local Agency Formation Com.* (1982) *post,* page 816 [187 Cal.Rptr. 423, 654 P.2d 193] which concerns an annexation, rather than a secession election. Although the voting procedures in the two cases are quite similar, the majority reaches opposite conclusions in the two matters, upholding the constitutionality of the procedure in *Citizens,* but striking down the procedure here.

The majority attempts to explain this inconsistency in result by suggesting that the state has a more "compelling" interest in the annexation procedure than the secession procedure, but the suggested distinction seems strained at best. In the case of both annexation and secession, the state has a comparable interest in assuring that local boundary lines are drawn so that government services are reasonably accessible to all citizens and are cost-efficient. Moreover, in both instances the state also has a legitimate interest in granting local communities some measure of control over their own destiny.

to or severed from an existing district.[2] Unlike the majority, I do not believe that such a procedure is "constitutionally suspect" or subject to "strict scrutiny" merely because residents of neighboring areas who may also be affected in some manner by the reorganization are not granted the right to vote on, and potentially veto, the proposal.[3] As I explain, the governing United States Supreme Court decisions establish that states enjoy very broad discretion in devising procedures for the formation or reorganization of local political subdivisions, and no decision of which I am aware suggests that this broad discretion does not include the authority to grant a carefully limited measure of autonomy to residents of a local community who want to declare their independence from, or affiliation with, an existing political unit. Although the state could, of course, choose to give residents of other areas the opportunity to block such a change, I believe the majority errs in suggesting that the equal protection clause presumptively grants these other other persons a constitutional right to such veto power.

A major flaw in the majority's analysis is its failure to take adequate note of the United States Supreme Court decision in *Hunter* v. *Pittsburgh* (1907) 207 U.S. 161 [52 L.Ed. 151, 28 S.Ct. 40], the seminal constitutional decision addressing a challenge to a state procedure regulating the formation and organization of local governmental entities. In *Hunter,* residents of Allegheny, Pennsylvania challenged the validity of a state statute which authorized the consolidation of two cities—Allegheny and Pittsburgh—if a majority of the total votes cast in a referendum in the two cities approved the consolidation. The plaintiffs in *Hunter* pointed out that because Pittsburgh had a much greater population than Allegheny, state law effectively permitted Pittsburgh to "swallow" Allegheny without any regard to the wishes of the Allegheny residents; they contended that such a reorganization procedure was patently unfair and unconstitutional.

---

[2] Actually, the governing statute in this case does not *require* that the election be held only in the territory to be severed from an existing district, but instead simply authorizes the relevant county committee on school district organization to "determine if . . . the election shall be held only in such territory." (Ed. Code, § 4375.) Although the county committee's authority to designate the area in which the vote is to be held may, as a practical matter, permit the committee to affect a particular election's outcome, no claim has been made that the committee's power in this regard is itself unconstitutional and I do not address this aspect of the statutory scheme.

[3] The majority suggests at one point that because the residents in adjoining areas do not vote in the secession or annexation election, the procedures at issue in this case and in *Citizens* deny "any voice to [these individuals] either directly or through their elected officials." (See *Citizens, post,* p. 816.) This suggestion, however, totally ignores the critical role played in the reorganization process by the pertinent regional planning agencies—the county committee on school district reorganization in this case, and the county LAFCO in *Citizens.* The Legislature has consciously designed the membership of these regional planning agencies to assure that the agencies are broadly representative of all citizens of the affected regions. (See Ed. Code, §§ 4290-4293; Gov. Code, §§ 54780-54784.)

The *Hunter* court unanimously rejected that constitutional challenge, explaining the exceedingly broad discretion which a state enjoys in regulating the formation or reorganization of political subdivisions within its boundaries: "Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. . . . The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. . . . The State . . . at its pleasure may modify or withdraw all such powers . . . expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation . . . there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it." (207 U.S. at pp. 178-179 [52 L.Ed. at p. 159].)

Although subsequent cases have properly recognized that *Hunter's* broad language must necessarily be qualified by a state's fundamental constitutional obligation to avoid racial or other invidious discrimination (see, e.g., *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125]), recent Supreme Court decisions have not wavered from the basic proposition that states have "extraordinarily wide latitude . . . in creating various types of political subdivisions and conferring authority upon them." (*Holt Civic Club* v. *Tuscaloosa* (1978) 439 U.S. 60, 71 [58 L.Ed.2d 292, 303, 99 S.Ct. 383].) In my view, the majority fails to give adequate consideration to this fundamental point, a point which forms an important backdrop to the constitutional challenge in this case.

The decision in *Hunter,* of course, preceded the voting rights cases of the 1960's and 1970's by several decades, and the majority has apparently concluded that under those cases the referendum procedure at issue here is constitutionally suspect because it grants the right to vote to some individuals who will be affected by the proposal—the residents who live in the area to be severed from, or annexed to, an existing district or city—but not to residents of other areas who also will be in some way affected by the proposal. There is a fundamental difference, however, between the voting discrimination cases relied on by the majority and the cases now before us. In the voting discrimination

cases, the equal protection claim arose from the fact that the challenged statutes excluded, or discriminated against, one class of potential voters *within a single governmental entity*—most typically affording real property owners within a city or county a greater voice than nonproperty owners with respect to a matter of general governmental concern. (See, e.g., *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942 [104 Cal.Rptr. 297, 501 P.2d 537].) In the present cases, by contrast, the only "discrimination" that is present arises from the state's allocation of decision-making authority *between separate localities.* Individuals who reside in the non-Yorba Linda portion of the Fullerton High School District—and, in the *Citizens* case, the residents of Rancho Palos Verdes, the "annexing city"—are not barred from voting on the proposed reorganizations because they do not own real property or the like; rather the Legislature has decided that in matters of local reorganization the more numerous populations of existing school districts or cities should not invariably be able to control the destiny of a smaller community which wants to run its own show. In my view, recent decisions of the United States Supreme Court make it clear that the Constitution does not prohibit such a procedure.

*Lockport* v. *Citizens for Community Action* (1977) 430 U.S. 259 [51 L.Ed.2d 313, 97 S.Ct. 1047] is perhaps the closest case in point. In *Lockport,* the court faced a constitutional challenge to a New York law which provided that a new county charter could go into effect only if it was approved in a referendum election by concurrent majorities of the county's city and noncity dwellers. In the election in question, a proposed charter had been approved by a substantial majority of city dwellers but had been narrowly defeated by the less numerous noncity voters; thus, by virtue of the concurrent majority provision, the charter proposal failed, despite the fact that it had been approved by a majority of the votes cast in the election. In *Lockport,* several residents challenged the concurrent majority requirement as a violation of equal protection, invoking the same line of voting cases relied upon by the majority in the present case. They claimed that the procedure violated one person-one vote principles, giving the less numerous noncity voters a disproportionate power to thwart the wishes of a majority of all those affected by the vote.

The Supreme Court, in a unanimous opinion, rejected the equal protection contention. At the outset, the court explained that "[t]he equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives [i.e., the one person-one vote cases] are of limited relevance . . . in analyzing the propriety of recognizing distinctive voter interests in a 'single-shot' referendum. In a referendum, the expression of voter will is direct, and there is no need to assure that the voters' views will be ade-

812

quately represented through their representatives in the legislature. The policy impact of a referendum is also different in kind from the impact of choosing representatives—instead of sending legislators off to the state capitol to vote on a multitude of issues, the referendum puts one discrete issue to the voters. That issue is capable, at least, of being analyzed to determine whether its adoption or rejection will have a disproportionate impact on an identifiable group of voters. If it is found to have such a disproportionate impact, the question then is whether a State can recognize that impact either by limiting the franchise to those voters specially affected or by giving their votes a special weight." (430 U.S. at p. 266 [51 L.Ed.2d at p. 321].)

After concluding that New York could reasonably believe that county charter revisions might have a differential impact on city and noncity dwellers because such revisions would frequently transfer some functions or duties from towns or cities to the county, the *Lockport* court went on to uphold the constitutionality of the challenged procedure in language that has particular significance for the cases before us. Because of its pertinence, I quote the passage at some length. The court stated: "The ultimate question then is whether, given the differing interests of city and noncity voters in the adoption of a new county charter in New York, those differences are sufficient under the Equal Protection Clause to justify the classification made by New York law. . . . *If that question were posed in the context of annexation proceedings, the fact that the residents of the annexing city and the residents of the area to be annexed formed sufficiently different constituencies with sufficiently different interests could readily be perceived. The fact of impending union alone would not so merge them into one community of interest as constitutionally to require that their votes be aggregated in any referendum to approve annexation.* Cf. *Hunter* v. *Pittsburgh,* 207 U.S. 161. *Similarly, a proposal that several school districts join to form a consolidated unit could surely be subject to voter approval in each constituent school district.* [¶] . . . [I]n terms of recognizing constituencies with separate and potentially opposing interests, the structural decision to annex or consolidate is similar in impact to the decision to restructure county government in New York. In each case, separate voter approval requirements are based on the perception that the real and long-term impact of a restructuring of local government is felt quite differently by the different county constituent units that in a sense compete to provide similar governmental services. Voters in these constituent units are directly and differentially affected by the restructuring of county government, which may make the provider of public services more remote and less subject to the voters' individual influence. [¶] *The prc..-sions of New York law here in question no more than recognize the realities of these substantially differing electoral interests. Granting to these provisions the presumption of constitutionality to which every duly enacted state and federal law is entitled,* we are unable to conclude that they violate the Equal Protection

Clause of the Fourteenth Amendment." (Italics added; fns. omitted; 430 U.S. at pp. 271-273 [51 L.Ed.2d at pp. 324-325].)

This passage from *Lockport* is instructive in a number of respects. First, it makes clear that in fashioning a referendum procedure for annexation proceedings, a state may properly recognize that residents of an area to be annexed and residents of the annexing entity will very frequently have "separate and potentially opposing interests" in the proposed annexation and that—contrary to the majority's suggestion—an electoral process which distinguishes between these differently affected groups retains its "presumption of constitutionality." Second, the *Lockport* decision establishes that a state may devise its electoral procedures to protect the distinct interests of separate political entities, and may permit the views of a less-populous entity to prevail even if this defeats the wishes of a majority of all persons who will be affected by the decision.

Unlike in *Lockport,* of course, in the cases before us the electoral procedures do not give the residents of each separate entity a veto, but instead limit the referendum to the voters of the area to be annexed or severed. The Supreme Court's decision in *Holt Civic Club* v. *Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 99 S.Ct. 383], however, lays to rest any claim that this difference renders the procedure unconstitutional. At issue in that case was an Alabama statutory scheme which granted the right to vote for a city's legislators only to persons residing within the city boundaries, but at the same time gave the city authority to enact police and other regulations which governed certain populated areas outside the city limits. The plaintiffs in *Holt,* residents of an area on the outskirts of Tuscaloosa, contended that this statutory scheme denied them equal protection, asserting that because they were directly affected by the city's police regulations they—like the city's residents—should have the right to vote in its elections.

The Supreme Court rejected the constitutional claim, emphasizing that its past voting rights cases had all recognized the legitimacy of limiting the vote to those persons who were residents of the political entity vested with the authority to make a particular legislative decision. The court observed that many municipal decisions have effects outside the boundaries of the municipality, but that such effects have never been considered sufficient to bestow on nonresidents a constitutional right to vote in municipal elections. Spurning a suggestion that any system which denies the right to vote to some persons affected by a municipality's decision must be evaluated under a strict scrutiny test, the *Holt* court—citing *Hunter* with approval—reaffirmed that states have "extraordinarily wide latitude . . . in creating various types of political subdivisions and conferring authority upon them" (439 U.S. at p. 71 [58 L.Ed. 2d at p. 303]) and held that the equal protection question was simply whether the statutory scheme

"bear[s] some rational relationship to a legitimate state purpose." (*Id.*, at p. 70 [58 L.Ed.2d at p. 302].)[4]

In this case, as in *Holt*, the statutory scheme is not constitutionally suspect simply because it limits the vote to residents of the area to be annexed or severed. Although this area may not yet technically be a separate political entity, *Lockport* makes clear that its residents' interests are sufficiently different from others affected by the proposal that a state can properly treat it as a distinct entity. Furthermore, there is clearly a rational basis for the statutory classification at issue here: the state could reasonably decide—as a matter of substantive reorganization policy—that when a regional or statewide planning agency concludes that a reorganization proposal is in the best interest of the region and affected local entities, and when the residents of the local community whose affiliation is to be altered desire the change, individuals living in other local areas should not have the power to block the reorganization. Although the state could have concluded that another decision-making process was preferable, there certainly is nothing irrational in the procedure at issue here.

In sum, the combined teachings of *Hunter*, *Lockport* and *Holt* demonstrate that the election procedure before us is not unconstitutional. The majority's invocation of the strict scrutiny standard is not true to these cases and reads into the equal protection clause a constitutional preference for centralized decision-making that simply is not warranted. As one federal court recently observed in upholding an annexation procedure comparable to that at issue here: "[A]nnexation has its pros and cons, and . . . under our Constitution's principle of federalism, it is the prerogative of the individual states to resolve the conflicting interests involved in annexation disputes as they see fit. . . . The Constitution . . . enacts neither principles of consolidated metropolitan government nor

---

[4] I find absolutely nothing in the *Holt* opinion to support the majority's claim that that decision requires, or even authorizes, a court to look beyond the state-prescribed boundaries of a local governmental unit in order to "determine the constitutionally relevant boundaries . . . and subject to strict scrutiny any measure which limits voting within those boundaries." (*Ante*, p. 803.) On the contrary, *Holt* specifically rejected just such an approach, holding that the Alabama statutes were to be measured under the rational basis test even though they denied the vote to nonresidents of the city who were directly affected by the city's legislative acts.

In this regard, the *Holt* decision directly undermines the reasoning of the earlier Court of Appeal decision in *Hawn* v. *County of Ventura* (1977) 73 Cal.App.3d 1009 [141 Cal.Rptr. 111], upon which the majority heavily relies. In *Hawn*, the court applied the strict scrutiny standard in striking down a county ordinance which gave residents of an incorporated city an opportunity to vote on any proposal to locate an airport "in whole or in part" within the city's borders, but which did not afford a comparable vote to noncity voters who might also live in the vicinity of a proposed airport. In light of *Holt*, however, the strict scrutiny test appears inappropriate; although the airport proposal in *Hawn*, like the police regulations in *Holt*, may have directly affected nonvoting nonresidents as well as voting residents, *Holt* makes clear that that is not sufficient to render the electoral process constitutionally suspect. Instead, *Holt* establishes that a state may reasonably permit a city's electorate to decide matters which affect the city but which also have some extraterritorial effects.

those of decentralized government in villages and towns." (*Moorman* v. *Wood* (E.D.Ky. 1980) 504 F.Supp. 467, 473, 477.)

The majority's conclusion is perhaps attributable to an underlying concern that, on the facts of this case, the electoral procedure may favor a reorganizational proposal that will have an adverse impact on school integration. In other factual settings, however, the consolidated voting arrangement which the majority holds is constitutionally favored will have precisely the opposite effect; if, for example, the State Board of Education approved the expansion of a largely white school district to include an area with a predominantly minority school population in order to promote greater desegregation, the majority's approach—if consistently applied—would provide the residents of the "white" district with the power to veto the reorganization. This example demonstrates that the effect of a reorganization plan on school desegregation is an entirely distinct issue from the question of the general validity of an annexation on secession procedure under the equal protection clause. In my view, the majority's approach to the latter question is not supported by the controlling constitutional authorities and will substantially impair the state's ability to experiment with different systems of checks and balances to protect and accommodate the diverse interests that are inevitably present in local reorganization controveries.

Richardson, J., concurred.